FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.
SEP 0 6 2006
P.M.
TIME A.M.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
IVAN SURIEL,                                              MEMORANDUM
                              Petitioner,                & ORDER


                                                         04CV3451 (SLT)

               -against-


JOHN W. BURGE,


                              Respondent.
-------------------------------------------------X
TOWNES, U.S.D.J.

       The petition for a writ of habeas corpus is denied.  This memorandum briefly addresses

petitioner's claims.


I.       *Facts and Procedural History*

       On October 5, 1998, *pro se* Petitioner Ivan Suriel ("Petitioner" or "Suriel") was arrested

and charged with the murder of 24-year-old Peter Isadore ("Isadore"), who was robbed,

pummeled in the head with a hammer, and stabbed to death.  At trial, Jeffrey Cole ("Cole"), an

acquaintance of Petitioner, testified that two days prior to the murder, he met with Petitioner and

three other individuals (Kareem Bellamy ("Bellamy"), Marvyn Payne ("Payne"), and Eurgle

Ruan ("Ruan")) at 37-23 107th Street in Corona, Queens, where Isadore and Ruan, nicknamed

"Sleep," lived together as roommates.  (Tr. 171.)  Cole testified that the group met to plan the

robbery and murder of Isadore, who sold marijuana.  (*Id.*)  According to Cole's testimony,

Bellamy bought marijuana from Isadore and had sold some in an area Isadore designated as his

own. (Tr. 171-172.) Isadore had threatened Bellamy, and Bellamy wished to "get [Isadore] first." (*Id.*)

Cole testified that Petitioner, too, sold marijuana for Isadore and was unhappy with the way Isadore ran his business. (Tr. 172.) Cole and Payne agreed to participate in the crimes in support of Bellamy, a childhood friend, while Sleep (who was initially against the idea) eventually "just went along with it." (Tr. 173.) According to Cole, the plan was as follows: Sleep, Isadore's roommate, was to let everyone into the apartment, and everyone but Petitioner would congregate in Sleep's room while Petitioner talked with Isadore. (Tr. 174.) Thirty minutes later, according to Cole's testimony, Sleep was to leave the apartment, feigning a need for a soft drink, and retreat to Bellamy's backyard until Bellamy returned, when Sleep would return to his apartment and clear the crime scene of fingerprints. (Tr. 174.) Cole testified that, while Sleep was gone, Petitioner would pick a fight with Isadore over the money Petitioner believed Isadore owed to him. (Tr. 176.) This would cue the other men to enter Isadore's room and restrain him while the Petitioner slashed Isadore's throat. (*Id.*)

According to Cole, in the early morning hours of September 27, 1998, the group put the plan into action. Bellamy, Payne and Cole met at an area bodega to review the plan. (Tr. 177-178.) Cole testified that Bellamy brought with him three pairs of gloves. (Tr. 179-180.) Bellamy kept one pair and distributed the other two to Cole and Payne. (Tr. 179-180.) Petitioner was not provided with gloves. (*Id.*) When Cole, Bellamy and Payne arrived at Isadore's home, Petitioner was already in Isadore's bedroom. (Tr. 182.) The three went into Sleep's bedroom, where they remained until Sleep excused himself, as planned, to buy soda. (Tr. 185.) Soon after, a fight broke out in Isadore's bedroom, and the three entered the room, single-file. Cole claimed

2

that Payne hit Isadore in the head two to four times with a hammer they found in the room while Cole assisted by pinning Isadore down and the others punched him. (Tr. 188-189.) Cole claims that Petitioner then pulled out a knife and, as Isadore's body slid off of his bed, slit his throat several times. (Tr. 190.) Cole then searched the apartment and uncovered valuables, including marijuana, a cellular telephone, a beeper, jewelry, and $800 in cash. (Tr. 191.) According to Cole, Petitioner soon noticed that Isadore was still alive and stabbed him four times in the chest. (Tr. 192.)

Cole's testimony as to Isadore's wounds was consistent with that of Kari Reiber ("Reiber"), the medical examiner who performed the autopsy on Isadore. Reiber testified at trial that there were multiple superficial slash wounds to Isadore's neck, as well as three penetrating wounds. (Tr. 487-488.) Reiber also testified that there were five injuries to Isadore's chest– four stab wounds and one puncture wound – and multiple blunt injuries to the face and scalp of a size consistent with the hammer found in Isadore's apartment. (Tr. 488-496.)

New York Police Department Detective Anthony Johnson ("Johnson") was also a witness at trial. He testified that he attempted to contact Petitioner to discuss Isadore's murder, having learned that the two were acquainted. (Tr. 399.) Johnson alleges that he met with Petitioner soon after the murder was committed and interviewed him. (Tr. 401.) During the interview, Petitioner indicated that he was elsewhere during the murder but that he had learned of Isadore's death from another individual. (*Id.*) Johnson testified that Petitioner claimed to have visited Isadore's apartment after the police left, in an effort to collect personal belongings of his that were in the apartment. (Tr. 401-402.) Petitioner was not then apprehended. (Tr. 403.)

3

After a bloody fingerprint on the wall near Isadore's bed was found by the Latent Print Unit of the New York City Police Department to match Petitioner's print, Petitioner was brought in for another interview and read his *Miranda* rights. (Tr. 413.) Johnson testified that Petitioner was told that his previous rendition of the events did not make sense. (*Id.*) According to Johnson, Petitioner was asked to "rehash and memorialize" his initial statement. (Tr. 418.) In this written statement, Petitioner admitted that he saw Isadore that night, but only at a party that the two attended with others. (Tr. 422.) Petitioner's statement indicated that he spent the night at a friend's house, learned of Isadore's death the following day and retrieved his belongings from Isadore's home. (*Id.*) Johnson testified that again Petitioner was told of the incredulity of his story, and he composed a second written statement – his third overall – this time detailing a neighborhood feud between Isadore and other individuals and intimating that Sleep and others may have conspired to kill Isadore. (Tr. 429-430.)

Johnson testified that he then presented to Petitioner photographs of the crime scene, showing Petitioner's fingerprint in Isadore's blood and informed Petitioner that the print was his own. (Tr. 432.) According to Johnson, Petitioner began crying and composed a third written statement (his fourth overall), one in which he claimed that, after the party, he decided to purchase some marijuana and went to Isadore's house. (Tr. 432-437.) In the house were Sleep, two individuals referred to by Petitioner as "Rob" and "Drake," and two men Petitioner did not know. (Tr. 437.) Moments later, Rob, Drake and the unknown men headed toward Isadore's room. (*Id.*) On the way, one of the unknown men picked up a hammer and hit Isadore in the head. (*Id.*) The men started fighting in the living room, Isadore bled from his head and face, and the four men continued beating Isadore in his bedroom until either Drake or Rob took a knife and

4

stabbed Isadore in the chest. (Tr. 438.) Petitioner claimed that one of the unknown assailants threatened his life and the lives of his family members if Petitioner would not hold Isadore's arm down while the assailant slit his throat. (Tr. 439.) Petitioner explained the bloody fingerprint by claiming that he grabbed onto the wall by the window when getting up from holding Isadore.[1] (*Id.*)

Johnson testified that Petitioner then agreed to give a videotaped statement. In the statement (Petitioner's fifth overall), Petitioner substantially repeated the details of this fourth statement. However, this time, Petitioner claimed to have gone into Isadore's bedroom and held Isadore down *on his own volition* and in order to expedite the robbery. Petitioner claimed to have believed that if he prevented Isadore from fighting the attackers, he would bring an end to the beating, allowing the attackers to rob Isadore and depart. Additionally, this time – and on videotape – Petitioner claimed that the alleged threats were made *after* the crimes were committed, and that the assailants sought to prevent him from going to the police. Also notable were Petitioner's claims that Isadore had been hit in the head with the hammer once, and stabbed once, in direct contrast not only to Cole's testimony but also to that of Reiber, the medical examiner.

Petitioner did not testify at trial or call witnesses. In closing, Petitioner's defense counsel ("Defense Counsel") argued, *inter alia*, that Cole was not a credible witness; that Officer Johnson erroneously considered Petitioner a suspect based solely on his discussions with Sleep on the morning of the murder; and that Petitioner was coerced into giving multiple statements,

---

[1] Incidentally, the bloody fingerprint was taken not from the wall by the window on which Petitioner claims he grabbed, but from the wall above Isadore's bed, as testified to by Police Officer Robert Lurch. (Tr. 282-283.)

5

the substance of which Petitioner changed solely to suit the demands of the police. (*See generally* Tr. 524-540.)

On May 1, 2001, Petitioner was convicted of felony and intentional second-degree murder, first-degree robbery, and one count of tampering with evidence. On June 7, 2001, Petitioner was sentenced, as a second violent felony offender, to indeterminate prison terms of from twenty-five years to life on the murder charges (felony and intentional second-degree murder), a definite term of twenty-five years on the robbery conviction and an indeterminate term of two to four years on the evidence-tampering charge.

Petitioner appealed his conviction to the Appellate Division, Second Department, on March 27, 2003. He presented three arguments. Firstly, Petitioner claimed that, given his statement that one of the unknown assailants threatened to kill him and his family if Petitioner did not hold down Isadore's arms, the trial court deprived Petitioner of the right to a fair trial by refusing to instruct the jury on the affirmative defense of duress. Second, Petitioner argued that the prosecutor's summation unfairly shifted the burden of proof by commenting on the lack of corroboration for the Petitioner's statement. Finally, Petitioner argued that the trial court erred in ordering that the sentence for intentional murder run consecutively to the sentence for first-degree robbery, in that the actus reus of the murder was a material element of the robbery. On November 10, 2003, the Appellate Division affirmed Petitioner's conviction, finding that the trial court correctly refused to instruct the jury on the affirmative defense of duress and that Petitioner's prosecutorial misconduct claim was partially unpreserved, and, in any event, did not warrant reversal. *People v. Suriel*, 1 A.D.3d 467 (N.Y. App. Div. 2003). However, the Appellate Division modified Petitioner's judgment of conviction by directing that the sentences

6

imposed for counts one and four run concurrently instead of consecutively. Petitioner was

denied leave to appeal to the Court of Appeals on December 22, 2003. *People v. Suriel*, 1

N.Y.2d 581 (N.Y. 2003).[2]

On April 27, 2004, Petitioner filed the instant petition for a writ of habeas corpus,

presenting two of the three arguments put forth in his direct appeal: (1) that the trial judge's

refusal to instruct the jury on the affirmative defense of duress deprived him of the right to a fair

trial and the right to present a defense, and (2) that the prosecutor's summation[3] improperly

shifted the burden of proof and denied Petitioner's right to a fair trial. After the Respondent

failed to submit a timely response to this Court's October 6, 2004 Order to Show Cause, the

Court, on January 14, 2005, ordered Respondent to produce responsive pleadings no later than

February 15, 2005. (Docket No. 4.) Respondent failed to respond until April 1, 2005.

Petitioner has since written a flurry of letters to the Court inquiring as to whether his petition

would be considered unopposed, and objecting to the Respondent's opposition papers.

II.      *Discussion*

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal

court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on

---

[2] Petitioner also filed a motion pursuant to N.Y. Crim. Proc. L. § 440.10 ("440 motion"), arguing that his statement should be suppressed and that newly discovered evidence (in the form of statements by Payne and Bellamy), if admitted at trial, could have resulted in a verdict more favorable to Petitioner. Petitioner's motion was denied on July 23, 2003. Petitioner did not seek leave to appeal his 440 motion.

[3] The relevant portions of the prosecutor's summation will be set forth in the discussion to which it relates.

the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (*quoting Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, *J.*, concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applies clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d. Cir. 2000) (internal quotation marks omitted).

"[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton*, 295 F.3d 270, 278 (2d Cir. 2002) (citation omitted); *see also Yung v. Walker*, 341 F.3d 104, 111 (2d Cir. 2003) (amended opinion) (district court's habeas decision that relied on precedent from the Court of Appeals is remanded for reconsideration in light of "the more general teachings" of Supreme Court decisions). The Court of Appeals for the Second Circuit has also indicated that habeas relief may be granted if a state court's decision was contrary to or an unreasonable application of "a reasonable extension" of Supreme Court jurisprudence. *Torres v. Berbary*, 340 F.3d 63, 72 (2d Cir. 2003). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### A.    *Prosecutorial Misconduct*

In this case, Petitioner argues that the prosecutor impermissibly attempted to shift the burden of proof by commenting on the lack of corroboration for Petitioner's version of the events. When Petitioner presented this argument to the Appellate Division, it ruled that this contention "is, in part, unpreserved for appellate review, and, in any event, does not warrant reversal." *Suriel*, 1 A.D.3d at 468. We now turn to the question of whether Petitioner's claim is preserved.

1.    *Procedural Bar*

A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it (absent a showing of cause and prejudice) even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

"Because it can be 'difficult to determine if the state law discussion is truly an independent basis for decision or merely a passing reference'. . .such reliance on state law must be 'clear from the face of the opinion.'" *Fama v. Commissioner of Correctional Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (*quoting Coleman*, 501 U.S. at 732, 735). In other words, "a procedural default does not bar consideration of a federal claim on. . .habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris*, 489 U.S. at 263. The Appellate Division's finding that Petitioner's "remaining contention is, in part, unpreserved" is not a clear or express statement indicating the court's reliance on a procedural bar and thus, this Court may consider Petitioner's claim of prosecutorial misconduct.

10

2. *Merits of Petitioner's Prosecutorial Misconduct Claim*

"A prosecutor who wishes to argue in summation that the government's evidence has been largely uncontradicted must walk a fine line." *United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990). A prosecutor may not make comments that function as to shift the burden of proof to the defense on any element of the crime charged or comment on a defendant's decision not to testify. "The Supreme Court has instructed federal courts reviewing habeas claims brought by state prisoners and premised upon prosecutorial misconduct in summation to distinguish between 'ordinary trial error of a prosecutor and that sort of egregious misconduct. . .amount[ing] to a denial of constitutional due process.'" *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) (*quoting Donnelly v. DeChristoforo*, 416 U.S.637, 647-648 (1974)).

"A prosecutor's improper summation results in a denial of due process when the improper statements cause substantial prejudice to the defendant." *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981) (citations omitted). "To determine whether a prosecutor's summation caused 'substantial prejudice,' the Second Circuit has established a three-factor test considering (1) the severity of the misconduct; (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the improper statements." *Moore v. Warden*, 380 F. Supp. 2d 321, 330 (S.D.N.Y. 2005) (*citing Floyd*).

As to the first component, the Second Circuit has ruled that, "where the defense summation makes arguments and allegations against the government, the prosecutor may respond to them in rebuttal." *United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998); *see also United States v. Rivera*, 971 F.2d 876, 883 (2d Cir. 1992) ("The prosecutor's remarks were legitimate responses to [Defense] counsel's arguments that [Petitioner] had. . .been framed by the

11

cooperating witnesses and the government."); *Modica*, 663 F.2d at 1181 ("Among the elements

weighed in this inquiry are the extent to which the misconduct was intentional and the extent to

which the statements were made in response to defense contentions."). Turning to the comments

at issue in the instant case, a review of the record reveals that, during summation, Defense

Counsel repeatedly attacked the government's evidence, including calling into question the

veracity of Cole's testimony and that of Detective Johnson. For example, Petitioner's counsel

argued:

> The first officer on the scene said I got there, and who do I speak to. Sleep.
> Detective Johnson said in the course of his investigation he spoke to Sleep, and
> based on what Sleep told him he decided Ivan was lying to him.

(Tr. 529-530). The prosecutor objected on the grounds that petitioner's counsel was misstating

the testimony. (*Id.* at 530.) She then said, in closing:

> You have the pictures of that room. There was blood everywhere. You have the
> pictures of that too. On the floor, on the walls, on the ceiling and in that blood
> popped out a pattern, a pattern that a seasoned detective who has a resume that is
> unbelievable, as defense counsel indicated, saw a fingerprint, and that fingerprint
> came back to one and only one person, the defendant, and there is no evidence in
> this case to contradict any of that.

(Tr. 541.) Assuming *arguendo* that these comments were improper, the prosecutor was merely

responding to Defense Counsel's suggestion that Detective Johnson's suspicion of Petitioner was

unsupported by anything other than the rendition of a missing witness.

Defense Counsel also spent a considerable amount of time attacking the credibility of

prosecution witness Cole, beginning with the statement that "the only two versions of what

happened in that room on that night come from [Petitioner] on the videotape and the liar that the

people called." (Tr. 525; *see also id.* ("In order to save himself and get the deal that he

12

demanded, [Cole] had to come in here and tell the truth according to the district attorney."); *id.* at

527 (Cole "is a guy who doesn't give a damn about the truth.").)

In response, the prosecutor stated:

> [Defense Counsel] gets here and he makes a blanket assertion, you shouldn't believe Jeffrey Cole.
>
> [. . .]
>
> You see, [Defense Counsel] came up here and he said basically this whole case hinged on Jeffrey Cole.
>
> [. . .]
>
> Well, [Defense Counsel] said don't believe Jeffrey Cole because he has a cooperation agreement.

(Tr. 543-544.) Thereafter, the prosecutor also stated that Cole

> was arrested in 1998, and from the first minute, the very first time he ever met the New York City Police Department who was prepared to arrest him, his story never changed.
>
> [. . .]
>
> At no time, at no time when he met the police officers– he told them several things which [*sic*] is uncontradicted in this courtroom.
>
> [. . .]

(Tr. 548-549.) Indeed, the prosecutor discussed the credibility of Cole at length, *see id.* 453-557,

all in response to Defense Counsel's attack of the witness, including the prosecutor's statement

that Petitioner's version of the events was uncorroborated. (Tr. 568-9.) The prosecutor began

that discussion with the following:

> Finally, remember when I talked about corroboration and I talked about Jeffrey Cole, that the blood is on the wall, and he says the guy was on the bed. That there

are four stab wounds and there are four stab wounds. Well, I'll submit to you that nothing really corroborates this defendant's accounting.

[. . .]

I will point out parts that are not corroborated, and then again you're certainly – you can discount them or you could look for others. But this defendant says in the video that [Isadore] was hit with the hammer once. . . .Well the problem is that the medical examiner of Queens county came up here. She showed you this diagram. . .these are consistent with. . .the hammer that was brought to her. . .but she tells you at least ten contusions to the head.

Look, defendant only says he was hit once. It doesn't corroborate. Additionally, he's asked and he's asked by ADA Catapano, how many times did you see [Isadore stabbed]. His response was just once. . . .You know for a fact based on the medical examiner that he was stabbed at least four times in the chest. Two pokes in the neck. Slashing across his neck, okay. Doesn't corroborate another.

(Tr. 568-570.) Thus, any references to the lack of corroboration for Petitioner's version of the events was made in response to Defense Counsel's suggestion that only two people knew what happened on September 27, 1998 at Isadore's home – Cole and Petitioner – and that Cole had been proven a liar. "Defendant cannot now complain about the issues raised and the atmosphere created by his own making through the defense summation." *Tocco*, 135 F.3d at 130; *see also United States v. Bubar*, 567 F.2d 192, 199 (2d Cir. 1977) ("The prosecutor is entitled to comment on a defendant's failure. . .to support his own factual theories with witnesses.") (citations omitted).

Furthermore, the trial judge reminded the jury that the burden of proof is always on the prosecution. When offering the jurors the opportunity to have Cole's testimony read back to them, the following colloquy took place:

Prosecutor:                  Here's the transcript. I have a copy. Defense attorney has a copy. This nice young lady takes it down. She'll be ready

14

|                  |                                                                 |
|------------------|-----------------------------------------------------------------|
|                  | and willing to read it to you. You see, that's a problem that the defense attorney can't get around. |
| Defense Counsel: | Objection. I don't have to get around anything. |
| The Court:       | Overruled. Of course – you know – the burden is always on the people. |

(Tr. 550.)

In the jury charge, the trial court stated:

> There are certain fundamental principles that apply to criminal cases in general. These basic principles of law apply to every criminal case conducted in the courts of New York State regardless of the nature and seriousness of the crime charged.
>
> [. . .]
>
> The law provides that all persons charged with a crime who are brought to trial are presumed innocent. The presumption of the defendant's innocence remains until such time as you find, if you do so, the defendant's guilt has been proved to your satisfaction beyond a reasonable doubt.
>
> The law provides that the burden and responsibility of proving the defendant's guilt beyond a reasonable doubt is upon the People. The burden never shifts, and it remains on the People during the entire trial. The defendant has no burden to prove or disprove anything.

(Tr. 584-5.)

Instructions such as these have been held to cure any possible prejudice to a defendant. *Rivera*, 971 F.2d at 884 (no prejudice where trial judge gave instruction that government always has the burden of proof which "never shifts," despite prosecutor's implication that Defense Counsel, during cross-examination of a police officer, should have elicited certain testimony supporting defendant's claim); *see also United States v. Cruz*, 797 F.2d 90, 93 n.1 (2d Cir. 1986) (prosecutor's comment, in summation, that "[t]he defense. . .has to convince you" did not deprive defendant of a fair trial because it was "surrounded by statements to the jury. . .by the

15

government and by the court, that the burden at all times remained on the government."); *Bubar*, 567 F.2d at 199-200 n.9 (comment that defendant "has in no way explained" a piece of evidence cured by jury instruction and failed to constitute prosecutorial misconduct).

Additionally, the case against Petitioner was strong. His videotaped statement (which was the last of five statements containing numerous inconsistencies) told a story irreconcilable with the medical and forensic evidence, including his claim that Isadore was hit with the hammer and stabbed only once and his claim that his bloody fingerprint was on the wall by the window – claims which stood in direct contradiction to the testimony offered by the prosecution witnesses. Furthermore, Petitioner's final statement quite frankly defied reason. He claimed that unknown assailants attacked Isadore out of the blue and in front of Petitioner. Petitioner further alleged that, after the assailants dragged Isadore into his bedroom, Petitioner felt he should help end the beating by preventing Isadore from fighting the assailants. According to his videotaped statement, Petitioner chose to effectuate the end of the beating by holding Isadore's arms while an assailant slit his throat. Under these circumstances, Petitioner has failed to allege prosecutorial misconduct. *See, e.g., Modica*, 663 F.2d at 1182 (no prosecutorial misconduct where prosecutor made improper comments, trial court failed to cure and "trial record strongly indicates that the jury would have convicted [defendant] even if the improper statements had not been made" where, *inter alia*, defendant's explanation was "implausible and refuted"); *Parker*, 903 F.2d at 98 ( "Even where the prosecutor's argument was clearly impermissible, we have been reluctant to reverse where the transgression was isolated, the trial court took swift and clear steps to correct the implication. . .and the evidence against the defendant was strong."). Petitioner's claim of prosecutorial misconduct is, therefore, without merit.

16

B.       *Jury Instruction on Affirmative Defense of Duress*

Petitioner also claims that the trial court violated his right to a fair trial by failing to instruct the jury on the affirmative defense of duress, a defense Petitioner alleges was supported by the evidence at trial.  In general, "it is not the province of the federal habeas court to reexamine state court determinations on state law questions." *Estelle v. McGuire*, 502 U.S. 62, 63 (1991).  However, "[o]nce states have promulgated laws to define criminal conduct. . .federal due process protects a defendant from conviction unless he is shown in a fair proceeding to have violated [state] laws." *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001).  "Where an error in a jury instruction is alleged. . .[t]he question is not whether the trial court gave a faulty instruction, but rather 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Davis*, 270 F.3d at 123 (*quoting Cupp*, 414 U.S. at 147; *citing Estelle*, 502 U.S. at 72).

"[A] finding that the petitioner was erroneously deprived of a jury instruction to which he was entitled under state law is the first step in the determination [of] whether that error violated the petitioner's federal due process rights." *Davis*, 270 F.3d at 123.  Under New York law, Petitioner was entitled to a jury instruction on duress provided that any reasonable view of the evidence could support a finding of duress.  *See, e.g., New York v. Farnsworth*, 65 N.Y.2d 734, 735 (N.Y. 1985) ("Where the issue on appeal is whether a particular theory of defense should have been charged to the jury, the evidence must be viewed in the light most favorable to the defendant.").

New York Penal Law § 40.00 law provides:

17

> In any prosecution for an offense, it is an affirmative defense that the defendant engaged in the proscribed conduct because he was coerced to do so by the use or threatened use of unlawful physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist.

> The defense of duress. . .is not available when a person intentionally or recklessly places himself in a situation in which it is probable that he will be subjected to duress.

Under this definition, no reasonable view of the evidence supported a jury instruction on the law of duress. Petitioner's last written statement may have alleged that he held Isadore down only because he was forcibly threatened to do so, but Petitioner also claimed that the men went into Isadore's room and left him sitting in the living room. Viewing Petitioner's third written statement in isolation, "not only would it not have been objectively reasonable for [Petitioner] to believe his life was in danger, but it would have also been the case that [Petitioner] could have retreated in complete safety." *Blazic*, 900 F.2d 534, 540 (2d Cir. 1990) (if "those portions of the evidence upon which [petitioner] premised [his] theory" do not support petitioner's argument, charge is not warranted). Furthermore, Petitioner's final (and only videotaped) statement specifically denied that he has been threatened prior to his unilateral decision to assist in the commission of the murder and robbery of Isadore. On videotape, Petitioner states that he went into Isadore's bedroom and voluntarily restrained him while an assailant slit Isadore's throat. Petitioner states that *after* Isadore's throat was slit by an assailant, he was told that he and his family would be killed should he decide to go to the police.

That one of Petitioner's many renditions of the events of September 27, 1998 alleges that he suffered duress does not alone require the trial court to instruct the jury on the affirmative defense, particularly where, as here, no other evidence supports a finding of duress. *See Blazic*,

900 F.2d at 540 ("[A] court is not required to adopt an artificial or irrational view of the evidence in deciding whether a justification charge is warranted."); *New York v. Butts*, 72 N.Y.2d 746, 750 (N.Y. 1988) ("The critical question. . .[is] whether th[e] defense, viewed separately, was supported by the trial evidence."); *cf. Davis*, 270 F.3d at 131 (finding "substantial likelihood that a properly instructed jury would have found in [petitioner's] favor on the homicide charge" where the evidence on the issue of justification was "quite favorable" to petitioner).

Given the record before this Court, it cannot be said that a reasonable view of the evidence supports the defense of duress. Because "due process does not require the giving of a jury instruction when such charge is not supported by the evidence," *Blazic*, 900 F.2d at 541, the trial judge's failure to charge the jury as to Petitioner's claim of duress does not violate federal law.

### C.     *Petitioner's Objection to Respondent's Opposition Papers*

Respondent's failure to submit a timely response to the petition does not mean that the writ is automatically granted. *See, e.g., Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) ("The fact that there has been no response to a. . .motion does not, of course, mean that the motion is to be granted automatically."); *Foster v. Phillips*, 2005 WL 2978686, at *3 (S.D.N.Y. Nov. 7, 2005) ("This Court. . .cannot grant a motion. . .solely on the ground that it is unopposed."). To the contrary (and as stated *supra*), a federal court may only grant a writ of habeas corpus upon a showing that a state prisoner's claim was adjudicated in state court "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C § 2254(d). Furthermore, it is Petitioner's burden to show, by a

19

preponderance of the evidence, that his constitutional rights have been violated. *Machado v. Commanding Officer Plattsburgh Air Force Base*, 860 F.2d 542, 544 (2d Cir. 1988). Because Petitioner's submissions fail to show such a violation, the Petition must, in any event, be denied.

III.    *Conclusion*

The petition for a writ of habeas corpus is denied. No certificate of appealability is granted with respect to any of the Petitioner's claims, Petitioner having made no substantial showing of the denial of a constitutional right.

**SO ORDERED.**

Dated: Brooklyn, NY
       September ___, 2006

SANDRA L. TOWNES
UNITED STATES DISTRICT JUDGE